UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
———————————— DIVISION

|  |  |  |
|---|---|---|
| JOSE J. DELACRUZ | ) | CIVIL ACTION NO. _____ |
| Plaintiff | ) | |
| | ) | |
| | ) | **00-6171** |
| versus | ) | |
| | ) | **CIV-ZLOCH** |
| U.S. DEPARTMENT OF LABOR | ) | |
| | ) | **MAGISTRATE JUDGE** |
| ALEXIS M. HERMAN | ) | **SELTZER** |
| | ) | |
| SECRETARY OF LABOR | ) | |
| | ) | |
| Defendant | ) | |

'00 FEB -2 PT2:32

**EMPLOYMENT DISCRIMINATION COMPLAINT**

1.    This action is brought under Title VII of the Civil Rights Act of 1964 for employment discrimination.   Jurisdiction is conferred by Title 42 United States Code, Section 2000e-5.

2.    The plaintiff is:            Jose J. delacruz

            Address:            2420 N.E. 7th Avenue

                        Ft. Lauderdale, FL  33305

    County of Residence:            Broward

3.    The defendant is:            Alexis M. Herman

        Address:            U.S. DEPARTMENT OF LABOR

                    200 Constitution Avenue, N.W.

                    Washington, D.C.  20210

_____X_____    Check here is there are additional defendants.  List them
              on a separate sheet of paper with their complete
              addresses.

    4.  The plaintiff has attached to this complaint a copy of
the charges filed on _November 5, 1993_____ with the Equal
Employment Opportunity Commission.

    5.  On the date of _November 24, 1999____ , the plaintiff
received a Notice of Right to Sue letter issued by the Equal
Employment Opportunity Commission; a copy is attached.

6.  Because of the Plaintiff's"

    (a)  _____  race

    (b)  ___X___  color

    (c)  _____  sex

    (d)  _____  religion

    (e)  _____  national origin,

    the defendant has:

    (a)  _____  failed to employ the plaintiff

    (b)  ___X___  terminated the plaintiff's employment

    (c)  _____  failed to promote the plaintiff

    (d)  _____  other: _____

              _____

              _____

6.  When and how the defendant has discriminated against the
plaintiff:

              Copy attached.

    _____

    _____

    _____

    _____

    _____

3.   Additional defendants:

JANET S. RANKIN

Commissioner, Bureau of Labor Statistics

Region IV

61 Forsyth Street S.W.

Atlanta, Georgia  30303

JIM R. BEDDINGFIELD

Supervisory Economist

Bureau of Labor Statistics, Region IV

61 Forsyth Street S.W.

Atlanta, Georgia  30303

8.   The plaintiff requests that the defendant be ordered:

(a) _____ to stop discriminating against the plaintiff

(b) _____ to employ the plaintiff

(c) __X__ to re-employ the plaintiff

(d) _____ to promote the plaintiff

(e) __X__ to pay lost wages of $20,000 _____

_____

_____ and that;

(f) __X__ the Court grant other relief, including injunctions, damages, costs and attorney's fees.

_____
Signature of Plaintiff

Address: _____ 2420 N.E. 7th Avenue _____

Ft. Lauderdale, FL  33305 _____

Telephone: ___ (954) 566-9948 _____

Friday, September 17,1993,  I was called into meeting by Jim Beddingfield who asked for my resignation or he said he would serve termination notice that afternoon.  I had just learned that morning when reporting in to him that the meeting about adverse action but nothing else.  I asked the acting worker's union steward about it, she knew what was about to happen and agreed to attend the meeting with me.  I submitted ficticious notice of resignation to avoid the "indelible black mark" Mr. Beddingfield promised to place on my employment record if he didn't get my resignation that afternoon.  I would prepare the statement as Mr. Beddingfield instructed, with no use of the word discrimination.  Mr. Beddingfield suggested that I use travel as an official reason to resign.  I felt exploited, that I had been railroaded and was concerned with possible violation of rights.

Over the weekend I had related the events to a friend who helped me prepare notice that the previously submitted resignation was null and void.

On Monday September 20, 1993, Mr. Beddingfield met with the union steward privately in his office.  I was not invited. According to Mr. Beddingfield's notes of the event, the union steward pleaded for a 3 to 4 month extension of time to prove myself.  Mr. Beddingfield's  only response was that it was necessary to terminate my employment prior to the end of the

probationary period.  After the meeting, the union steward
took me to a Chinese restaurant to tell me what was discussed.
The union steward told me he could help find another job
for me, I told him that I thought the termination was wrongful
and discriminatory.

I delivered the previously prepared notice by hand the very
next morning to Mr. Beddingfield's apparent anger.  I told Mr.
Beddingfield I would be out sick that day and as I was leaving
he was heard saying that I wouldn't know what "sick" was.
The effective date of the termination would be days shy of
completing the probationary year of a federal employee and
less than three months from the time I actually started
working under Mr. Beddingfield.  I was oppressed the whole
time I was under Mr. Beddingfield's supervision.  I would not
be given opportunity to work independently although in the
previous nine months I had independently collected
information from hundreds of establishments with no known
complaints from respondants or office reviewers.  In the one
and only appraisal I received, my performance was rated as
good or better than at least one other employee who was hired
in at the same time for the same job and is currently employed
with the agency.  During the whole time I worked in Mr.
Beddingfields unit, I was expected to report to the field
office while others were permitted to work in their respective

living quarters.  Mr. Beddingfield would not approve sick
leave the one other time it was requested although it was
reported to the unit secretary who accepted it and handled
other requests the same way, one example of how he treated me
differently.   Mr. Beddingfield used the military term AWOL,
absent without leave, in describing the situation although he
had a phone number to reach me at.

The effective date of the termination coincide with the end of
the pay period.  I was expected to report to the office even
though there was no work assigned to me.  Mr. Beddingfield
checked in on me accompanied with another supervisor to ensure
that I didn't leave the office.   The acting union steward
informed me that she could arrange for me to meet with
commissioner Janet Rankin but would return later and report
that Ms. Rankin was not available.  Ms. Rankin never gave me
an opportunity to respond to the adverse action before it was
taken.

I tried to reason with Mr. Beddingfield citing prior
performance but he would dismiss the work done under the
previous supervisor, labelling the previous supervisor as
"soft".  Mr. Beddingfield was determined to remove me before
the probationary period was over.  The termination of
employment order was signed by then assistant commissioner
Jerry G. Adams. It was known to everyone in the office

that Mr. Adams would be retiring soon.  Mr. Adams was the
person most responsible for hiring me.  As I cleaned out my
assigned office mailbox, I came across an awards program
recognizing Mr. Beddingfield and Mr. Adams for their efforts
in establishing a locality pay system for federal employees.

I had earned a Bachelor of Arts degree in Economics from
Florida International University in January 1991.  I had
signed up to attend a presentation on January 23, 1991 given
by the U.S. Bureau of Labor Statistics, the Bureau was
interested in hiring Economics majors.  I was only one out of
dozen or so in attendance that the recruiter actually gave an
application packet to, when I asked why, he said that I asked
good questions.  I was encouraged to apply and submitted
application for an open competitive position with BLS.
Between September 1990 and October 1991,  BLS Atlanta hired an
unprecedented number of 23 Field Economists to collect data to
establish a locality pay system.  Among those hired was
Shirley Brown.
Ms Brown was unlike the other new hires in that she had
several years of federal service behind her.  She would tell
me that she had been a recruiter for Tennessee Valley
Authority prior to her employment with BLS.  An equally
unprecedented number of Field Economists, eight white and two
black employees left their positions within a year or shortly

thereafter.  The white to nonwhite ratio was nearly 1:1 among
the expansion staff employees before I was hired.

Early September 1992.  My mother in Key West, Florida received
phone call from Mr. Adams who said he had a position open and
left message to return the call if interested.

My parents are naturalized U.S. citizens who immigrated from
the Philippines in 1961. The Philippine people are a mixed
race of primarily Chinese and Malay stock.  The Philippines is a
nation of islands located in the south Pacific Ocean.  Skin
color of Filipinos can range from light to dark brown.  The
Philippines were colonized by Spain centuries ago.  Many
natives took on Spanish family names.  The U.S. helped
Filipinos defeat Spain.  The U.S. also helped educate
Filipinos and granted the country independence.

The Philippines is said to be one of the largest English
speaking countries in the world.

My father made a career of his enlisted service with the U.S.
Navy without a high school education.  My mother would take on
several jobs outside of raising five children such as working
in a shrimp packing house and cooking at the church rectory.

My mother was so excited when she got the call from Mr.
Adams that she called me at work to let me know.  I was
working for a small business owner in the Miami area at the

time, the area was hard hit by Hurricane Andrew.  The business
owner was appreciative of the way I returned to work after the
hurricane and would throw a farewell party for me. My father
purchased a briefcase for me. Everyone thought this was going to
be a big opportunity for me.

Mr. Adams arranged for me to meet a senior field agent for a
face-to-face interview to explain the job.  It was an entry
level professional position with minimum educational
qualification of a four year college degree.  No previous work
experience required although I did have comparable work
experience collecting statisical data as an enumerator
during the 1990 census.  I had also been honorably
discharged by the U.S. Army after four years of active duty.
I marked off the one-time use veteran's preference on my
employment application. The agent explained that the job
required a lot of automobile travel to cities throughout the
southeast.  The agent explained that I would be interviewing
respondants at various establishments identifying those
occupations the agency wanted to collect wage data on.  A paper
schedule would be completed with the information and sent to the
office in Atlanta.  The collected info would be reviewed in
Atlanta and later sent to Washington D.C.  The work I would do
is done in the field.

The agent stressed that the reason many field economists leave

the agency is due to the travel and wanted to make sure that it
wasn't a concern as I would be assigned to work on a team that
did not collect information in Florida.  He did not tell me why,
I assumed that there were no job vacancies on the team.  After
reassuring the agent that the travel would not pose a problem,
he said that he would recommend that Mr. Adams hire me on.  I
completed another application to update the previous one.  Mr.
Adams called again to confirm the job offer, he
told me that he would hire me at the GS-5 pay rate and if I did
not agree he would hire someone else.  Needless to say, I
accepted the job on given terms.

October 4, 1992, reporting date for appointment.  I was hired in
with three others, two white males, one white female.  I learned
that the white female was assigned to the team which works in
Florida; the team supervised by Jim Beddingfield.  I also
learned that I was hired in at a pay grade lower than the
others to perform the same work.  During inprocessing, the new
hires met with commissioner Janet Rankin who welcomed us.  She
had reviewed our employment applications as she recognized the
name of the university I attended.  She told us that she started
her career with the department bureau doing field work that we
were hired to do.
During inprocessing, I met with a couple of the expansion
staffers who were leaving.  I did not meet either of the former

employees of color who left.

After inprocessing, I attended preservice training in
Washington,D.C.  That's where I first met Ted Holman.  Mr.
Holman was one of two trainers, he was a senior field economist
assigned to BLS Atlanta under the supervision of Mr.
Beddingfield at that time.  One of the training activities was
to conduct a mock interview.  Mr. Holman would pose as the
respondant and the trainee was to initiate contact and obtain
cooperation of the respondant.  Mr. Holman would make this
task more difficult by providing reasons for not wanting to
participate in the survey as it is voluntary.  On the occassion
I was chosen to do a mock interview, Mr. Holman made the task
easy by not asking any questions and readily agreeing to
participate.

During the training we were informed that submission of
falsified data were grounds for dismissal from the Bureau.
We were also informed that falsified qualifications were another
ground for dismissal.  Mr. Holman circulated a story of one
instance when a field economist was caught and fired.  At the
end of the training course there would be an exit exam.  We did
not get the results at the training site, we were told that the
scores would be forwarded to our respective supervisors and we
were to contact our supervisors to review the results.  There
was no mention of any written comments that could be included

with the scores without the trainee's knowledge.

Following preservice training I was sent to Nashville Tennessee.
My supervisor at the time would assign me to work with Michael
Enslin to begin on the job training.  Mr. Enslin was hired in
the previous year, and would provide mentoring.  I would be the
first employee he mentored.  There are no additional
qualifications or special training mentors receive.  Mentors
aren't true trainers, they simply have more experience and are
expected to share that experience as there is no direct
supervision in the field. I first met Mr. Enslin the day after
Bill Clinton was elected President, November 1992.  Mr. Enslin
liked to share advice and tips. He was ambitious, he said that
he was already seeking a better job with the agency OSHA.  He
advised me to present ID when contacting a reluctant respondant,
and showed me the official badge he used in the field for
identification, he seemed surprised to learn that I had not been
issued one.  Mr. Enslin was personable, and would talk freely
about himself.  He told me that his mother was of Korean descent
and that his father was of Germanic descent.  Mr. Enslin told me
that his previous work experience was in sales.
On the first day we met, he observed a phone contact I made to a
respondant to schedule an interview and stated that I did well
for someone with little sales experience.  I accompanied Mr.

Enslin on his scheduled visits, with each visit he allowed me
to do as much of the interview as I felt comfortable doing. By
the end of the week, Mr. Enslin thought that I was ready to have
someone with even more experience observe my work, Alfred
Manual. Mr. Enslin gave me a list of assigned establishments in
the Nashville area to schedule interviews. Mr. Enslin also
advised me to make weekly phone calls to our supervisor in
Atlanta, Charles Chinnis. Mr. Enslin explained that Mr. Chinnis
liked to hear from Field Economists in his unit on a regular
basis.

Alfred Manuel makes his home in the Nashville area where he is
duty stationed, he would state during our work together that he
had trained a large number of field economists with the agency.
Mr. Manuel seemed impressed with my interviewing skills on the
initial visit done together but on subsequent visits would
become more critical. These accompanied visits and the write-up
of a schedule done by the trainee would be credited to the
trainer towards production, the average number of hours to
complete a schedule. But that didn't bother me as much as
having to reschedule visits because Mr. Manuel could not make
the visit. On more than one occassion I rescheduled visits for
Mr. Manual's convenience. I could never reach Mr. Manuel
directly by phone, there were times I waited the better
part of a workday for a response from him. I was told that we

would make six visits before I could work indepe........
the end of the sixth visit with Mr. Manuel, he stated that
still needed to observe him interview respondants on six visits.
I objected to his request since I had already observed Mr.
Enslin conduct interviews on at least six visits and did not
want to coordinate visits around his schedule.    I spoke to our
supervisor at the time about this on a weekly routine phone call
to him.  Later that day I would receive a call from Mr. Manual
and he would say that I was free to collect data independently
and would release a complete work assignment to me.
I did observational visits with Mr. Enslin and Mr. Manuel for
the better part of a month.
January 5, 1993.  After completing assignment in the Nashville
area I  was sent to eastern Tennessee to work on my second
survey.   At the start of the survey I met with a co-worker
hired in at the same time I was.  He brought my work assignment
for this survey with him from Atlanta.   This co-worker made his
home in the Atlanta area and would admit that he did not enjoy
being away from from his family for extended periods of time.
During the course of this survey, Wilson Romero was sent from
the Atlanta office to observe two interviews.
The visits were done on January 27, 1993, after two months or so
.of independent data collection.    Mr. Romero would observe me
nterviewing respondants at two of the largest establishments

participating in the survey (600+ employees) with a potentially
large number of job matches and wage data to be collected.  Mr.
Romero simply observed the interview, keeping his participation
in the interview at a minimum. At the end of the interview I
would ask Mr. Romero if he had any questions for the respondant
in case I had missed or forgotten anything but he had few if any
questions.   After each visit I received verbal feedback from
Mr. Romero.  We discussed the information collected, he  asked
me about possible job matches.  I don't recall any criticisms
from Mr. Romero regarding interviewing skills or knowledge of
data collection, his opinion at the time was that I was
collecting enough information from the respondants to complete a
good write up.

Upon completion of this survey I returned to the Atlanta office.
I worked on clarifications reviewers had on write-ups I
submitted.  I received a performance appraisal from supervisor
Charles Chinnis on March 3, 1993.  My performance was rated
"fully successful" on all elements evaluated.  Mr. Chinnis
explained the ratings to me in relation to other field
economists with the same experience.  He continued to say that
he would have recommended advancement to the next pay grade but
that it would not be approved as I was still under probation.
Mr. Chinnis was supervisor to myself, Michael Enslin,
Alfred Manual and Wilson Romero at the time.  Any major job

performance problems observed by any of the three should have been considered in the appraisal. The co-hire met at the start of the survey was eventually reassigned to work for another BLS program which did not require travel. We were told that a survey respondant threw him out of an establishment.

I continued to work independently. I travelled to western Kentucky to collect data. Michael Enslin distributed the work assignment for this survey. Mr. Enslin noticed an establishment assigned to me that he visited in the previous year. He had asked that he accompany me to this establishment as he applied for a job with them. I spoke with the respondant to schedule a visit on March 9, 1993. It would be the last visit me and Mr. Enslin would do together. I collected most of the information during the interview with the exception of a series of trade occupations that Mr. Enslin wanted to cover to impress the respondant. Because he had matched these jobs previously it would be more efficient for him to update the information. From western Kentucky I travelled west to Evansville, IN. I was able to collect wages data without refusal from all the establishments assigned to me in Evansville. April 1993. I worked on the wage survey for Augusta, Georgia. This survey was unlike previous ones I had been involved in as all of the same establishments in the previous year survey would

be recontacted.

All my visits in this survey were done independently.  The schedules from the previous survey would be used.  I discovered on a follow-up visit done the previous year by Shirley Brown that she had recorded information on a high level technical position that didn't exist.  I had asked the respondent twice about this position to determine possible reason for the apparent error, but concluded that the information had been falsified.  I also discovered a schedule submitted by Michael Enslin in the previous year that appeared to be completely falsified.  I worked this survey with one other field agent who was hired in during staff expansion.  As he had more experience, it was he whom I received my work assignments from and to whom I submitted my work to.  This co-worker would congratulate me on obtaining the cooperation of one respondent who would not participate the previous year.

After the Augusta survey I returned to the Atlanta office, it was the first week of May 1993, there was a lot of talk in the office about reorganization.  The wage program would create a third team to accomodate the expansion staff, there would be a supervisory position to fill.  Among those considered was a black male who had tenure over others in the program seeking the promotion, the position would evenually be given to a white male outside of the program.  I spoke with Mr. Enslin at the office,

he seemed concerned when he asked me about my requested team assignment. I also discussed team reassignment with the fellow team member I was hired in with. During the conversation, Mr. Adams was walking by and stopped to say hello, he wanted to know what we were talking about.

By the third week in May 1993, I was at work on the last survey prior to reorganization in Louisville. Mr. Manual was coordinator and it was he that I received my work assignment from. There was at least one visit that I made on this survey accompanied by Mr. Manual. Mr. Manual wanted me to accompany him on this visit, because the establishment employed a larger number of workers than he thought I had ever encountered. Mr. Manual wanted me to observe him interview because I had done few observe trainer visits with him. I took notes and wrote up the results. Mr. Manual would review the write-up in the field before it was submitted to Atlanta. I remember at least one job match that Mr. Manual wanted me to change. I made the change in respect of Mr. Manual's professional judgement. It was during this survey that I learned that I had been assigned to work under Mr. Beddingfield. By the time reorganization took place I had participated in five surveys, completed hundreds of schedules with all of my work done independently with the exception of initial visits done with Mr. Enslin and Mr. Manual which were done over a period of three weeks.

The change in my assigned unit would follow the Professional Job training course to be held in Nashville, June 23- July 2, 1993. The Atlanta office coordinated the training dates.   The group I was hired in with, 10/92, attended this training course at the same time.  We were the last group, by date of hire, from a district office to attend.  We were told this was due to logistical reasons, not enough slots in previous classes.  The course expanded the list of occupations we would collect information on.  We learned the different duties, responsibilities, and educational qualifications for survey professional jobs.  We learned that matching professional survey jobs to actual jobs is imperfect and that many reviewers disagree on exclusions and job level matches especially higher level job matches.  Experience is the most effective means of improving job matching skills. A multiple choice or short answer quiz with 5-10 questions would be administered after each topic was covered and the answers discussed.  A longer comprehensive exam would be given at the end of the course.  The results of the exam along with a disclaimer that the results were not an indicator of future job performance was forwarded to the employee's supervisor.

Friday afternoon, July 2, 1993.  I returned to the Atlanta office for a meeting with Mr. Beddingfield.  This would be my

first face-to-face meeting with Mr. Beddingfield.  I remember
the meeting as being short, cold and impersonal.  Mr.
Beddingfield did not discuss results from the training session,
did not talk about prior job performance.  Mr. Beddingfield gave
me specific orders to report to Shirley Brown in Tampa at the
hotel she was staying at.  Mr. Beddingfield gave me Ms. Brown's
hotel phone number with instructions to call her when I
arrived in Tampa.  Mr. Beddingfield said that I would train with
Ms. Brown first, indicating that I would train with others.  Mr.
Beddingfield did not discuss his expectations or any additional
qualifications that I needed to meet in order to work
independently.

July 7, 1993 was the date I first met Shirley Brown in Tampa.
She was standing next to the front desk of the hotel lobby.  I
barely introduced myself before she would criticize me for being
minutes late.  Ms. Brown wore her straight brown hair shoulder
length during the time I worked with her.  Ms. Brown's skin
color is white with light freckles on her face. She applied a
red shade of lipstick on her lips, wore a scoop neck knit top, a
pair of shorts cut high on the hip, and high heels.  She fixed
herself a cup of coffee and then sat across from me in the
lounge area of the hotel lobby.  She crossed her legs taking no
more than a couple of sips before excusing herself to
get dressed.  She handed me the confidential wage data of the

establishment we would visit that morning to study in the lobby while she got dressed. Ms. Brown returned quickly wearing a business woman's suit, she had a smile on her face.

On the first visit we did together Ms. Brown offered the interview to me and I accepted. The establishment was not chosen for professional job matches, so I could not apply the knowlwdge learned in the last training. Ms. Brown told me to conduct the interview from scratch although the establishment had provided information for the last two years in the Tampa survey, information she just had me study prior to the interview. The respondent greeted us and brought us to her office, enroute the respondant revealed the industry and scope of business. Once in the office I explained that I would be conducting the interview. Business cards were exchanged. I asked the respondant if the information was correct and the respondant indicated it was.

Ms. Brown immediately interrupted and told me to read aloud the information off the card, which I did. Ms. Brown interrupted again asking about the industry and scope of business. When I told Ms. Brown what I heard prior to the interview, Ms. Brown corrected me without verifying the information with the respondant. Ms. Brown would ask me to verify this information during recontact. Despite the interruptions, the respondant encouraged me to continue, reassuring me that I was doing fine.

secretary previously matched.   The respondant never responded
and several job matches were excluded.

July 8, 1993.  Ms. Brown and I were returning to the Tampa field
office from that mornings visit.  After exiting the vehicle, Ms.
Brown  remarked that I didn't log the mileage before exiting my
vehicle.  I told her I would note the mileage before I drove in
it again. Ms. Brown insisted that the mileage be recorded before
I exit my POV but didn't say what difference it would make,
rather that Mr. Beddingfield wanted it that way.  Because I
thought she was petty and unreasonable, I suggested that we not
train together. At that point Ms. Brown called me "difficult".
For Ms. Brown to make that assessment so early in our
working relationship bothered me and I explained this to her as
we entered the field office.  Ted Holman was in the office at
the time. Ms. Brown offered a senseless solution while having
lunch.  She said she would drive to interviews she would
conduct.   Ms. Brown drove to an afternoon appointment with a
map over the steering wheel and make a wrong turn, I offered to
navigate but Ms. Brown didn't want me to assist.
We were working with Ms. Brown's work assignment and Ms. Brown
had scheduled all of the visits. So Ms. Brown instructed me make
crank phone calls to practice making an initial contact with a
respondant.  She called this cold calling practice and got Ted

I thanked the respondant and added that I hoped Ms. Brown
thought so too.  But Ms. Brown jumped into the interview again
as I was about talk about accounting clerks.  Ms. Brown would
ask questions pertaining to the old schedule write-up.

Ms. Brown laughed at the simularity she saw in the name of a
company employee and a movie character, neither myself or the
respondant understood the humor so Ms. Brown explained the name
was simular to Marty McFly, the character in the Back To The
Future, neither I or the respondant reacted.  The respondant
directed her responses to me after that point in the interview.
An interview that lasted two hours.
In the days following the interview,  Ms. Brown wasn't confident
of the matches made on accounting clerks so she would ask Ted
Holman for his opinion.  Ms. Brown wanted me to call back the
respondant so I prepared specific short answer questions for the
respondant.  When I showed the questions to Ms. Brown, she
crumpled up the page of questions up, saying we weren't going to
"spoonfeed" the respondant.  She revised the question to read,
"What are they doing?"
I got in touch with the respondant two weeks later.  When asked
about the accounting clerks, the respondant wanted the question
in writing.  I transmitted by fax this question along with even
more questions Ms. Brown wrote including one about a highly-paid

Holman to watch by slapping him on the back and exclaiming "Look at him!"  On one occassion Mr. Holman's wife called the office and Ms. Brown asked Mr. Holman to pass the phone call to me and Mr. Holman obliged.  I wanted to demonstrate that I could schedule appointments in order to work independently.  I also wanted to demonstrate that I could conduct an interview independently for the same reason.

The following week Ms. Brown told me that she had rescheduled interviews because she said I wasn't making progress.  Ms. Brown agreed to meet me at the hotel room that I was staying at to work on the write-up of the interview I did.  While I made coffee, Ms. Brown excused herself to use the bathroom at least three times.  I had fixed the coffee the way she wanted, which was black, but Ms. Brown didn't stay long or drink any coffee or assist in the schedule write-up for that matter. Ms. Brown left suddenly.  I felt like she was there simply to invade my privacy.  Just after she left, I received a phone call from the only other employee who did observational visits with Ms. Brown.

The call was from the female employee, hired in at the same time I was, assigned  to Mr. Beddingfield's unit prior to reorganization. She called Ms. Brown a "real bitch" explaining that as Ms. Brown scheduled early morning visits, it would be necessary to get up at dawn to allow enough time to locate the

establishment and get there on time to avoid criticism.  It

bothered her that Ms. Brown described her voice as "irritating"

to respondants.  I related past week events with her

because she was the only person who understood.  We both

believed Ms. Brown behaved strangely but neither of us knew why.

This co-worker would state she believed Ms. Brown is lesbian,

which I thought strange due to the initial meeting with Ms.

Brown.  I was advised to maintain a journal of our visits

together.

On a visit done July 14, 1993, Ms. Brown reviewed the name of an

establishment on a pre-printed label with the respondants verbal

reply and then claim that I couldn't take notes since I only

wrote down what the respondant said without seeing the label.

Ms. Brown would tell me that I could only document things I saw

and/or heard and after reviewing a schedule I wrote up on a

visit done July 26, 1993 accused me of false documentation in

the presence of Mr. Holman and other BLS employees in the

office.  Then with no one other than myself present,  she would

call the establishment to verify that the documentation I

provided was correct.  Ms. Brown did not apologize.

Ms. Brown told Mr. Holman that some of the information she

collected previously was red flagged by the national review

office in Washington D.C. and had to make additional call backs.

Ms. Brown also seemed disappointed at not being able to gain

participation of one of the largest establishments in the
survey, one that could potentially have many professional job
matches.

The Tampa field office was approximately four hundred total
square feet divided into two rooms.  The door between the two
rooms would be kept open while we were in the office.  I often
worked in the office to write up the schedule of data and
documentation by hand.  While I worked, Ms. Brown and Mr. Holman
and a third senior BLS employee talked about other employees.
Ms. Brown talked most about a black woman who was hired in at
the same time she was and assigned to Mr. Beddingfield's team.
Ms Brown would say unimpressed that this young woman was a
graduate of Spelman College.  Negative comments regarding
the work and non-work performance of this employee by other team
members were made.  Ms. Brown thought the young woman should be
made to report to the office as I was.  On one occassion, the
young woman called the office to say she had car trouble, no one
in the office wanted to help the team member so I was allowed to
help her.  Ms. Brown explained how an attempt to fire this
employee backfired because the agency's actions weren't timely
and the young woman filed a grievance.  Ms. Brown said that the
agency lost for not providing adequate training.  Ms. Brown
asked me what I thought about this individual, since I had not
worked with this individual I could not offer an opinion.

Ms. Brown also spoke of a male colleague who reported to EEO his race to be white although he may appear to be black to most. Mr. Beddingfield was Ms. Brown's only regular contact who had access to EEO reports.

Ms. Brown asked me what I thought of my previous trainers, Mr. Manual and Mr. Enslin twice. The first time she asked I thought about the problem I had with Mr. Manual and decided not to say anything. The second time Ms. Brown asked me about my former trainers I thought it unappropriate so Ms. Brown would describe Mr. Manuel as "funny" and say she had gotten to know Mr. Enslin well during classroom training they attended together to get me to talk.

Ms. Brown would tell me that Mr. Beddingfield is actively involved with Boy Scouts of America and that he attended law school. Ms. Brown also noted that Mr. Beddingfield is not well-received at the national office. Ms. Brown should be a reliable source of information as she noted that she socialized with Mr. Beddingfield and Mr. Adams outside of the office, stating that she attended a Braves baseball game with them. In fact, Ms. Brown released me early from work one Friday because she would be going away for the weekend, but she would say that she deny telling me this if asked. Ms. Brown told me that Mr. Beddingfield did not want to hear about any problems in the field.

Ms. Brown asked me what I thought about Mr. Beddingfield in Ted Holman's presence.  I told her that I thought he went "by the book", my response influenced by a phone call I received from Mr. Beddingfield in Atlanta when he pointed out that I forgot to sign a leave form.

Ms. Brown once came into the room that I was working in and speak to a colleague in the other room about commissioner Janet Rankin.  She said to the other person and in my presence that the Atlanta EEOC received more complaints than any other district and that Ms. Rankin was appointed because she represented the only acceptable minority, female. Ms. Brown added that Ms. Rankin would allow the good ole boys run the show.  Ms. Brown and Mr. Holman once engaged in a conversation where they were talking about who could better brown nose the commissioner, a male or a female, they smiled at each other and laughed without further comment.

Ms. Brown asked me more personal questions than anyone I had worked with in the Bureau.  She knew that I was originally from Key West and said she enjoyed a trip to Key West, name-dropping a gay and lesbian resort as a place she visited.  I told Ms. Brown I knew someone who worked there.  To continue the conversation, Ms. Brown would press for more information but became disappointed when I told her that this person was a friend of a friend and did not know more about this person. Ms.

Brown would ask me what my favorite food was and I told her I
liked Chinese food.  Ms. Brown couldn't recommend a good Chinese
restaurant, but would insist on going to one she spotted a far
distance from the office.  Ms. Brown would ask about what kind
of music I liked.  I told her I had listened to a lot of country
music in the past year, Ms. Brown balked in disbelief. Ms. Brown
once initiated conversation in the car by asking what I thought
about child molestation.  On one occassion while I was working
in the Tampa office Ms. Brown and Mr. Holman literally had a
conversation behind my back, using pronouns and finger pointing
to refer to me while Ms. Brown made what would seem to be
contradictory remarks.  Ms. Brown said that she felt
"uncomfortable" around gays and then followed up with claim that
she had a lot of gay friends.

I worked exclusively with Ms. Brown from July 7 to August 11,
1993.  During that time, Ms. Brown would suggest that I talk to
myself in front of a mirror and prepare scripts for interviews
to improve job performance.  Ms. Brown would interrupt all of
the interviews I would conduct and tell me afterwards that I was
not controlling the interview but didn't say what made her
believe this.  When I told her that I did not want her
interrupting my interviews as it was embarrassing, she replied
that I embarrass myself. Ms. Brown would intimidate me, daring
me to "cry" to Mr. Beddingfield.  Ms. Brown led a chorus of

laughter the day after I had a bad haircut.  As my hair is
thick, it tends to stick up when cut short.  As my hair color is
black, it is more noticeable.  Ms. Brown would advise me to
start saving money over lunch one afternoon.  Ms. Brown
was creating a hostile working environment for me to work in.
Ms. Brown bullied another senior BLS employee in the Tampa
office who I would later work with by calling him a "wimp".

From August 12, 1999 through September 14, 1999 I participated
in the Miami survey.  I would be given a limited work assignment
and scheduled interviews with respondants.    There would be two
other BLS employees with more seniority than Ms. Brown that
would accompany me on visits.  Both would continue to interrupt
my interview in the same way Ms. Brown would but did not finish
the interview the way Ms. Brown did.  All of the accompanied
visits were observe trainee.  One of the seniors who accompanied
me on visits in Miami was Chuck Arton, I had not met with or
worked with Mr. Arton before.  I had heard that Mr. Arton had
been fired and rehired by the agency.  Mr. Arton would
appear stressed when he interrupted my interviews.  After one
interview he expressed anger at questions I asked regarding a
company financial loss.  Mr. Arton said strongly  that it was
none of my "damn" business and he started to speculate about how
terrible the respondant would feel to lose his job.  The
respondant gave no indication of this.  Mr. Arton's purposeful

interruptions would also be more obvious to one respondant who made comment to me at the end of the interview.  Mr. Arton confessed that he had told one establishment respondant that participation in our survey was mandatory rather than voluntary. Mr. Beddingfield was in the Atlanta office the whole time I was working in Tampa and Miami with the exception of August 30th and the 31st.  On the afternoon of the 30th, Mr. Beddingfield accompanied me to a visit to a relatively small establishment. I would start and finish the interview without interruption from Mr. Beddingfield.  I start the interview with general establishment questions and then describe types of work and job titles, whenever the respondant indicate simular workers in their establishment, I would ask more specific questions on the duties, responsibilities, and qualifications to determine a survey job match. On those occupations which match the survey definition I would request actual information on that worker. On both visits made with Mr. Beddingfield as I had done with all other mentors or seniors who observe my interview I would give him an opportunity to ask additional questions as they feel necessary or to collect information I may have missed.  Mr. Beddingfield did ask additional questions at the end of the first interview.  After we had left the establishment, Mr. Beddingfield and I discussed job matches, suggesting this was a collective work effort.

The establishment was relatively small and had few professional job matches, and as is the case with small businesses many of the employees perform a number of different jobs which can make matching them argueable. We were warned in classroom to use caution in matching jobs based on pay rates and forcing a match, matching a mixed job. Mr. Beddingfield wanted more information regarding a possible job match and I was to call back for clarification. There was no feedback on my interviewing skills or job performance. I had asked specifically if he had any comments because if he had any problems with my performance I could try to correct the problem prior to the second interview. Mr. Beddingfield indicated that he wanted to wait and I did not push for a response. That evening I would receive a phone call from the female co-hire. She asked me how my visit with Mr. Beddingfield went. I told her I felt the visit went well, the interview went smoothly, that Mr. Beddingfield did not make any negative comments about the interview or the information collected. The former co-worker would be relieved, she said she only made a couple of observed visits before she was allowed to make independent visits.

The next morning I attempted unsuccessfully to reach the respondant for clarification. At 11:00 AM on August 31, 1993 there would be an All Agents Meeting at the Miami field office called by Mr. Beddingfield and attended by Ms. Brown, myself and

the rest of the team working on the survey.  While Mr.
Beddingfield went over the information he needed to share with
us, Ms. Brown would interject a complaint she had with another
team member.  Mr. Beddingfield was not pleased and stopped
more than once to quiet Ms. Brown who persisted, saying that she
hated to "whine".  One of the topics discussed at the
meeting was the move from hand-written schedules to the use of
laptop computers to electronically send data from the field
directly to the national office in Washington D.C. The use of
laptop PCs would dramatically reduce processing and transmission
time.  After the meeting we all walked to a nearby restaurant
for lunch.  Ms. Brown insisted that I sit next to Mr.
Beddingfield but did not explain.

After lunch, I took Mr. Beddingfield to the second of two
observed visits.  The establishment was larger than the first in
terms of the number of employees.  There were more job matches
for the field economist to make.  The respondant was
knowledgeable about the jobs of all company employees which made
for increased confidence in job matches.  At one point during
this interview the respondant noted a pay grade range for a
group of workers. I did not pick up the complete pay scale
before discussing the workers but discovered after matching
a few that it would be more efficient to get the pay ranges
first.  At the end of the interview I asked Mr. Beddingfield if

he had any questions of the respondant, I don't believe he did.
After the visit we discussed the interview, Mr. Beddingfield
also seemed confident of the jobs matched and did not not ask
for additional callback.  I told Mr. Beddingfield what happened
when I called the first respondant earlier that day as I drove
him to Miami International Airport to catch his flight back to
Atlanta, he understood and instructed me to complete the write-
ups and to call him at the Atlanta office when they were
finished.  I would call Mr. Beddingfield as instructed hoping
that he would give me the go ahead to make independent visits,
but he didn't.  Mr. Beddingfield offered no reason for his
decision to have me continue with accompanied visits.  I was
upset but did not argue, I wanted to end the call.  At the
close of conversation, Mr. Beddingfield added advice to ask more
"probing" questions with a small chuckle in his voice.  I
remember his comment making no sense to me at the time.
It was perhaps a day or two after Mr. Beddingfield's Miami visit
that I answered the phone and it would be Mr. Adams in Atlanta
on the other end.  Mr. Adams asked me how I was, he said he was
calling for Mr. Beddingfield which I thought was strange because
Mr. Beddingfield should have been in the Atlanta office.
The only times I recall working alone was in the Miami office.
Occassionally Ms. Brown would be there.  Once Ms. Brown came in
with an ice cream cone, she remarked that she would have offered

to get me some but "knew" I couldn't eat it.  I never told Ms.
Brown that I couldn't eat ice cream.  I thought Ms. Brown may
have believed that I am lactose-intolerant as common in many
Asians.  Ms. Brown continued to go on visits with me when Mr.
Arton could not.  Ms. Brown continued to purposely interrupt
interviews.  On one of our our last visits she would calmly
offer chewing gum to me after taking over the interview, fully
knowing that I was furious with her.  I didn't even want to
discuss the information collected.  I remember Ms. Brown
talking to another co-worker in the Miami field office about a
transfer request to BLS Dallas.  Ms. Brown came into the Miami
field office to, as she might say, help me prepare for an
interview. She wanted to show what I look like during an
interview so she sat silent with her eyes glancing left, right,
up and down. It made me laugh, but Ms. Brown said she was
serious.  Ms. Brown proceeded to lecture me on how I cannot do
the job as if to brainwash me, I told her I did not agree so Ms.
Brown stormed out of the office yelling out that I can't
do the job repeatedly.
Monday, September 13, 1993.  That evening in my hotel room in
Miami I received a call from Mr. Arton, he was quiet, I thought
he wanted to tell me something but couldn't. He suddenly
exploded telling me that I go around a question like a "doughnut
hole." The next day in the office I would receive orders from

Mr. Beddingfield to report to his office in Atlanta and to leave
my assignment with the survey coordinator.  Mr. Beddingfield did
not say more.  I called the former trainee of Ms. Brown's for
help, she told me that she too had been called into Mr.
Beddingfield's office worried that she may lose her job but she
said that Mr. Beddingfield simply laughed.

September 22, 1993, five calendar days from the day Mr.
Beddingfield said he would serve termination notice.  I did not
review the letter with Mr. Beddingfield, he asked for my
signature, explained that my signature did not mean that I
agreed with the letter's content but merely receipt. The letter
states the reason for termination to be failure to qualify but
instead of citing the qualification I failed,
the letter cited poor performance based on his opinion. The
letter had no supporting documents, no performance appraisal
attached.  The letter did not fully explain administrative
remedy.

The union steward would give me the name of another union
official after he told me he couldn't help me find work.  The
friend who helped me regain my appellate rights would not help
me pursue the matter further, explaining that his only concern
was with my welfare.  I contacted attorneys in the Atlanta area
for legal advice, expense being the biggest obstacle.  I
contacted the union official I was referred to seeking help with

employment but there would be no help.  I would get an
invitation to attend a union conference, I attended but
there was no one there who could help me.  It was a dead end.  I
had to appeal.  Time was of the essesse.  I finally found
Equal Employment Opportunity Commission and there would be
distractions.  My car would get keyed while parked among
hundreds, its front end would get smashed while parked in front
of a friend's home.

I could no longer stay with friends and I had to find a place to
work on the initial complaint.  Since I had no more employment
leads in the Atlanta area I left for home after filing the
complaint with EEOC in Atlanta .  I returned to south Florida to
find an attorney and again found no one to help me.  I received
through the mail OJT obsevation forms collated with a pink paper
clip.  I had never seen the forms before. There was a completed
form for practically every visit made with Shirley Brown, Chuck
Arton, Jim Beddingfield and a former BLS employee.  There were
no forms completed by Michael Enslin, Alfred Manuel, or Wilson
Romero.  The forms had a list of questions and jobs that the
observer would rate subjectively.  Among the list of questions
is one about "probe matches", the only time I had heard that
term used was during the phone call to Mr. Beddingfield.  On
"probe matches", Ms. Brown marked "needs improvement" on all OJT
forms she completed.   EEOC initiated contact with me by phone,

as I missed the random call, EEOC would write that I was non-responsive. On January 13, 1994  EEO would finish counseling. They issued a letter giving me 15 calendar days to file a formal complaint. After the formal complaint was filed, It wasn't until December 1997 that I would get to request a hearing.  At the same time, I received the complete EEOC investigative file, it contained remarks made by commissioner Janet Rankin and Michael Enslin, it did not contain any remarks made by Shirley Brown.  The agency had made Ms. Brown the bad character.  I learned Ms. Brown had resigned after taking adminstrative leave.  She also filed an EEO complaint. Ms. Brown had remarried and her married name is Ritter.

Ms. Rankin's remarks would be brief, he's not cutting it. (paraphrase)  Mr. Enslin's remarks were just as bad, with no basis for any of the remarks he provided.   I tried again to find legal help, the Florida Bar had no referrals and the attorney offices I contacted would all say that they don't handle case against federal agencies. After my complaint was reassigned to a different judge for no known reason and after Mr. Enslin resigned for a position in private industry, I was given a hearing date.

I found an attorney to represent me through an advertisement.  I gave the attorney the complete EEOC investigative file and original documents to be used as evidence for the hearing

scheduled on May 12, 1999.  On that date the Agency had all of
its witnesses in attendance but it failed to provide a court
reporter.  The Agency representative, the EEOC administrative
judge and my attorney had a closed meeting.

According to my attorney the judge initiated settlement,
settlement ended with commissioner Janet Rankin's approval.  My
attorney told me the only reason Ms. Rankin settled was due to
her comments made in the EEO investigation.  The proposed
settlement was on the agency terms, the administrative judge
left immediately after hearing the terms, as he left he
suggested a clause but the agency representative claimed
that the department's word was good enough.
On June 10, 1999, nearly a month following the verbal
settlement, I received faxed transmission of the settlement
agreement from my attorney.  The eight terms of the agreement
were covered in four pages authored by four agency attorneys.
There was one clause in the agreement that was not mentioned in
the proposed verbal settlement.
The additional clause solely addressed my attorney's interest
who had already authored and signed a separate agreement on May
12, 1999 regarding his compensation.  I fired the attorney for
breaching his contract and representing his own interests at my
expense.  The judge considered a motion by the attorney to

withdraw which was permitted July 2, 1999.

I requested a new hearing date which crossed the judges notice
of new hearing date of July 14, 1999.   On that date, Mr.
Beddingfield testified that he made 2 visits with me to appraise
my performance.  Statistical conclusions made with only 2
obsevations are made with a low percentage of confidence and
probability.  Mr. Beddingfield doesn't take an average of the
time to write up the 2 schedules, just takes the worst of the 2
write up times to compare to the average.  Mr. Beddingfield was
well aware at the time that the average write-up time
using this method of collection would be insignificant with
laptop computer collection.  Mr. Beddingfield suggests another
false comparison be made of 2 different jobs.  Mr. Beddingfield
falsely compares the job of the field economist to the
respondants job.  Mr. Beddingfield for the agency contends that
I was in "training" for 11 months, misusing the term training.
He cannot define what satisfactory completion is in his improper
use of the term.  Mr. Beddingfield never compares my performance
using objective criteria with field economists with the same
amount of experience with professional jobs because my
peers performance was not rated with zero independent experience
matching professional jobs or with less than 3 months of
experience matching professional jobs. Mr. Beddingfield doesn't
mention that the data I collected was usable, used for inclusion

in the statistical study it was intended for.   Mr. Beddingfield
doesn't offer any evidence to support his claims.
This is perhaps why the agency representative and the judge made
it difficult for me to introduce any evidence to support my
complaint.  The EEOC administrative judge and agency
representative allowed only the evidence listed by my former
representative.  The attorney I hired did not return the
evidence given him as requested for the hearing.
The EEOC judge found for the agency.  He did say I presented a
prima facie case for discrimination by disparate treatment but
that I did not prove it.  The agency mailed me their final
decision which concurred with the judges recommendations.  I
have found passages in the text of the transcript which are not
accurate.  I don't agree with the decision and appeal to the
district court for a trial by jury.  I am alleging
discrimination by color, I contend that the white
individuals Mr. Beddingfield considered terminated resigned
freely to help him look good on paper.  I am also alleging that
the agency may have violated the Civil Service Reform Act of
1978 as I am perceived gay. More fundamentally, I allege that
the agency violated a constitutional right to due process before
the termination. I am a 37 y.o. single individual without a
domestic partner, I need my work to live independently.  The
agency purposely acted with malice and infringed upon my

liberty.

I plead with the court to appoint an attorney to me, pro bono, to restore access to an attorney the agency purposely denied, to provide a means of equality in this pursuit of justice.

The agency has had every advantage in its fight against the truth.

I plead with the court to respect and uphold the truth and the law.

JOSE J DE LA CRUZ
2420 N.W. 7th Avenue
Ft. Lauderdale FL 33305

**U.S. Department of Labor**    Office of the Assistant Secretary
for Administration and Management
Washington, D.C. 20210



[NOV 0 1 1999]
CERTIFIED LETTER -- RETURN RECEIPT REQUESTED -- Z 365 473 483


Mr. Jose de la Cruz
1214 Duval Street
Key West, FL 33040

                              DCR Case No. 4-04-074
                              EEOC Case No. 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X
Dear Mr. de la Cruz:

As the departmental official designated by the Secretary of Labor
to make agency decisions in cases alleging discrimination under
the Equal Employment Opportunity (EEO) Program, I hereby submit
my final decision on your complaint pursuant to 29 CFR 1614.110.

You requested a hearing before an Equal Employment Opportunity
Commission (EEOC) Administrative Judge, and your request was
forwarded to the Atlanta District Office of EEOC on March 13,
1998.  The Administrative Judge issued the enclosed Recommended
Decision on October 8, 1999, after conducting a hearing on
July 14, 1999.

It is my final decision to adopt in full the Recommended Decision
issued by Administrative Judge Robert P. Duffy, which contained
the Administrative Judge's finding that you had not proven that
you were a victim of discrimination based on "national origin or
any other basis" (Recommended Decision, pp. 24-25).  I have
reached this decision after careful review of the Administrative
Judge's analysis, which concluded with a recommended finding in
favor of the agency (Recommended Decision, p. 25).

This is a final agency decision on your complaint.  If you are
dissatisfied with the decision, you may file a notice of appeal
with EEOC, at any time up to thirty (30) calendar days after your
receipt of this decision.  The appeal should be submitted to
EEOC's Director, Office of Federal Operations, Equal Employment
Opportunity Commission, P.O. Box 19848, Washington, D.C. 20036.
Any statement in support of the appeal must be submitted to the
Office of Federal Operations, and to this office within thirty
(30) calendar days of your filing of the notice of appeal.  The
regulations at 29 CFR 1614.403(a) encourage the use of EEOC Form
573 in presenting an appeal to the EEOC, and a copy of this form
is enclosed.

If you elect not to appeal to the Commission, you may file a
civil action in an appropriate U.S. District Court within ninety

(90) calendar days of your receipt of this decision.  If you file
an appeal with the Commission, you may still file a civil action
in the appropriate U.S. District Court within ninety (90)
calendar days of your receipt of the Commission's final decision
on your appeal.  A civil action may also be filed anytime after
one hundred and eighty (180) days from the date of filing your
appeal with the Commission, if a final decision has not been
issued by the Commission's Office of Federal Operations.

If you choose to file a civil action, and you do not have, or are
unable to obtain the services of a lawyer, you may request the
court to appoint a lawyer to represent you.  In such
circumstances as the court may deem just, the court may appoint a
lawyer for you and may authorize the commencement of the action
without payment of fees, costs, or security.  Any such request
must be made within the above referenced ninety (90) day time
limit and in such form and such manner as the court may require.

You are also advised that if you file a civil action, you must
name the appropriate Department or Agency head as the defendant.
Failure to name the head of the Department or Agency may result
in the loss of any judicial redress to which you may be entitled.
The head of the Department of Labor is Alexis M. Herman,
Secretary of Labor.

Sincerely,

ANNABELLE T. LOCKHART
Director
Civil Rights Center

Enclosures

EEOC

Informal Complaint pp. 1 — 6

" In reference to item 4 of original complaint

Informal Complaint of Discrimination

**U.S. Department of Labor**
Office of the Assistant Se____ary for
Administration and Management
Directorate of Civil Rights

NOTE: Please read the statements on the reverse side before completing this form. Type or print all information clearly.

| 1. Employee/Applicant's Name | 2. Job Title and Grade |
|---|---|
| Jose Dewaruz | Economist GS-5 |

**3. Address (Include ZIP Code)**

a. Home
1214 Duval St
Key West FL 33040

b. Office
Bureau of Labor Statistics
1371 Peachtree St Ste 500
Atlanta GA 30367

**4. Telephone No. (Include area code)**

a. Home
(305) - 296-5027

b. Office
(404) - 347-2162

**5. Bases. (Please review definitions on the reverse side) (Check and specify which basis/bases you believe were discriminatory)**

☐ Race (Specify) _____
☐ Color (Specify) _____
☒ National Origin (Specify) _Filipino_
☐ Religion (Specify) _____

☐ Age (Specify) _____
☐ Disability (Specify) _____
☐ Sex (Specify) _____
☐ Sexual harassment
☐ Reprisal

**6. Give the date(s) and explain the specific action(s) giving rise to this complaint. (Use additional paper if necessary)**

On 9/23/93, 9 days shy of completing probation with BCS, wage program, Atlanta GA, my appointment was terminated due to failure to qualify. I claim that the training I received was conducted and evaluated unfairly due to a perceived difference in my skills and ability as a Filipino; the only Filipino assigned to work for the regional program.

**7. Corrective action(s) desired:**

Reversal

| 8. EEO Counselor's Name and Telephone Number | 9. Date you contacted the EEO Counselor |
|---|---|
| Laura Walker  347-4080 | 11/5/93 |

**10.**
I ☐ do ☒ do not care to remain anonymous.

**11.**
I ☒ have not ☐ have filed a grievance/complaint on the same issue with another office or union. The date filed and name of office or union are:

**12. My representative(s) is/are:**
(Name, address, telephone number)

None

**13.** I request that all correspondence be sent directly to ☒ me ☐ my representative(s).

| 14. Date | 15. Signature |
|---|---|
| 11/9/93 | _[signature]_ |

Form DCR-1

The level of knowledge and skills I developed
was never recognized, although I correctly
identified Attorneys (City of Large 7/22/93)
and correctly matched the work of many professional
jobs (US Foundry Mfg 9/2/93). In some instances
a higher level of knowledge was expected of me
such other trainees - i.e. citing specific examples
of high level work of professionals (Wolfberg Alvarez 9/2/93)
when such expectations were unreasonable given
my experience. Yet such different expectations
were placed on me as a Filipino.

There were incidents that occurred during
the training period that discredited my integrity.
On an observational visit 7/14/93, Shirley Brown
first asked the respondent for the name of the
establishment to which she received a reply and
then allowed the respondent to visually inspect
the self pre-printed ID label which was verified
to be correct. Because I only copied what I
heard, I was unaware of how the name appeared
on the label. Later that afternoon, Ms. Brown
pointed out a difference in the name and
proceeded to criticize me in the presence of
Ted Holman, Bill Theraan, JD Bauerman,
and Wilson Romaro saying that if I can't
take notes then I can't do the job.
Such attempts would not have been made if I were
not Filipino.

7.

(While reviewing the Client Schedule (7/28/93) in the presence of Ted Holman and Bill Thurman, Ms. Brown wrongly accused me of making up information. Saying that a statement I wrote regarding renovation being done at an establishment was not said by the respondent. I based the remark upon observing taped off areas, empty rooms, and scaffolding and the given statement that the establishment had been recently acquired and had just resumed operations after a long period of time. The next morning (7/29/93) with just the two of us present, she called to verify that the conclusion made was correct and it was.

I followed all instructions and advice given to me during training to the best of my ability including cold calling, during which on 7/15/93 Shirley Brown laughed, slapping Ted Holman on the back saying, "Would you attempt look at him!" as if she doubted my attempts at improving my interviewing skills.

Ms. Brown would later suggest that I write scripts, practice asking questions to myself, and would tell me to start mock interviews all over again if I didn't repeat lines word-for-word or if the delivery did not meet her satisfaction (7/25/93)

While preparing for one visit, she arrived in the office, looked at me, and wrongly accused me

during one
ssion she
...tated
...personated
...during an
...terview
...d
...chedule
...tutes
...draft
...unit...
...through she
...trying to ignore me,
...she said she
...serious.

about a particular job but something, to this she replied then I knew every thing. I began to tell her how I arrived to the same conclusion, but she wouldn't acknowledge my response of not doing so. I was referring to the Handbook of Definitions to come up with probing questions for an interview I had the next morning. When I tried to explain, she cut me off, insisting that I wasn't. She reviewed the previously done survey schedule and she came a concluded that it was "perfect". When I pointed out documentation that at the very least could not be acceptable, she told me not to ask any new questions and to just verify what was written last survey. Ms. Brown would this is contrary to what was prescribed to do with previously written schedules. If a schedule was done by certain colleague, then the whole schedule had to be redone. (8/25/83) and because Shirley Brown would bully them by calling them "easy".

Because of such incidences, I did not receive fair and impartial evaluations from successive trainers, Chuck Arban and Bill Thurman. Between the two, I had collected most, if not all the information needed to complete 6 schedules independently, which was the objective standard required of qualification. Had they not been influenced by past incidences of Ms. Brown, why did they wait so long before criticizing my interviewing technique? Actual interview took place on 8/24/83 (Wellington) and verbal critique on interview technique for that interview took place on 9/14/83. Ms. Brown had

4

Actual interviews took place 9/2/93 and 9/3/93 and I received written criticism on interviewing technique on 9/23/93. If they had a sincere interest in my success, they could have presented this part of their evaluation in a more timely manner.

Verbal criticism on 9/14/93 pertained to the wrongful interpretation of the intent of one question. At the conclusion of the interview on 8/27/93, I had asked the respondant, in this case, a controller, about the future of the business. The question had been meant to be positive, to express concern. I knew that the establishment was undergoing bankruptcy. Due to Hurricane Andrew, one location had to be closed and many workers had left the area. I thought the question was relevant for the next survey and that it was posed to someone who could answer the question without reservation, and he did -- business was not effected, it was ended a temporary rebuilding stage. Chuck Aton took the question in negative content saying it was "none of your damn business" and said that the respondant was offended and would probably be out of a job soon. *I told Mr. Aton that the question did not have that intent at all and that I would have apologized or would not expect a response if that were the case. Bill Thurman was in the next room during this incident in which my judgement was in question due to my perceived knowledge    5

as a ~~Filipino~~ an American of Filipino descent.

Because of the negative feedback my supervisor, James Beddingfield received, he was not able to view my work in a fair and impartial manner this led him to serve a letter of termination upon me based on a relatively small sample of my work without considering my performance prior to realignment or regard to the quality of the training I received. His decision was based on a lack of confidence in my ability to do the work as a ~~Filipino. He~~ an American of

I am asking the Regional Civil Rights Officer to please consider this complaint, as it is my first opportunity to be heard in meaningful manner. Damaging statements are included on the letter of termination and on OJT evaluation forms that I cannot afford to be left unaddressed As they limit my liberty to seek employment. Personally I found my work with the Bureau to be both rewarding and challenging. I believe that an investigation on my claims would prove that they are legitimate and valid. An investigation of my work would prove that I was an asset to the Bureau. I am concerned for new trainees who may be subject to the same discriminatory practices I experienced. No one should be treated unfairly due to national origin, race, color or any other trait. And certainly no one should lose their job as a result.

6

EEOC Formal Complaint pp. 1-14

In reference to item 4 of original complaint

Formal Complaint of Discrimination

**U.S. Department of Labor**
Office of the Assistant Secretary for
Administration and Management
Directorate of Civil Rights



NOTE: Please read the statements on the reverse side before completing this form. Type or print all information clearly.

| 1. Complainant's Name | 2. Job Title and Grade |
|---|---|
| Jose J. Delacruz | Field Economist GS-5 |

| 3. Home Address (Include Zip Code) | 4. Telephone No. (Include FTS or area code) |
|---|---|
| 1214 Duval Street<br>Key West, FL  33040 | a. Home (305) 296-5027<br>b. Office ( ) N/A |

| 5. Alleged Discriminating Agency (Name, Address and Zip Code) | 6. Your Current Agency (Name, Address and Zip Code) |
|---|---|
| Bureau of Labor Statistics<br>1371 Peachtree St. Ste. 500<br>Atlanta, GA  30367 | N/A |

**7. Basic allegations (Check and specify what race, color, age, etc.)**

- [ ] Race (Specify) _____
- [ ] Color (Specify) _____
- [X] National Origin (Specify)  Philippine
- [ ] Religion (Specify) _____
- [ ] Age (Specify) _____
- [ ] Handicap (Specify) _____
- [ ] Sex (Specify) _____
- [ ] Sexual harassment
- [ ] Reprisal

**8. Date and specific action(s) giving rise to this complaint. (Use additional paper if necessary)**

On 9/25/93, 9 days shy of completing probation with the Bureau of Labor Statistics, wage program, my appointment was terminated due to failure to qualify.  I claim that the training I received was administered with bias, and that On The Job and Quality Assurance evaluation forms were unfairly evaluated  due to my national origin.  I am of Philippine descent; the only Economist of such origin assigned to work for the regional office.

| 9. Corrective action(s) desired: | 10. I [ ] have [X] have not filed a grievance/complaint on the same issue with another office or union. If so, indicate below. |
|---|---|
| Reinstatement/ reassignment | Date<br>[ ] Admin. Grievance System _____<br>[ ] Union (Specify) _____ _____<br>[ ] Merit Systems Protection Board _____ |

| 11. EEO Counselor's Name and Telephone Number | 12. Date of Final Interview |
|---|---|
| Barbara C. Bridgeforth  (404)347-3200 | 1/13/94 |

| 13. Date | Signature |
|---|---|
| 2/15/94 | |

Form DCR-4

I began work on October 4, 1992. The job requires one to
arrange and conduct interviews with respondants from randomly selected
establishments in a geographical area for the purpose of collecting
wage data for statistical study. Rates of interest are compiled for
workers performing similar duties and having like responsibilities.
During the probationary period, I underwent two phases of training.
The initial phase prepares the Economist to conduct a wage survey of
limited scope independently. The second phase introduces professional
occupations to the survey. This is called a full job list. Each
phase of training begins with formal classroom training sessions
conducted by trainers from the national office. The trainee then
takes to the field for on the job (OJT) training to build upon the
knowledge with actual experiences. To pass OJT, the trainee makes
six  personal visits observing the trainer and six visits with the
trainer observing the interview conducted by the trainee independently.
After each visit,  the trainer completes an observation form. The
trainee must satisfactorily demonstrate an interpretive set of qualifiers.
Qualifiers regarding the set of interviewing qualifiers are illustrated
in the Department's Manual of Procedures Volume III. It is to the
discretion of trainer, a designated Senior Field Economist, to credit
the trainee for the interview based on the amount of assistance the
trainee received to complete the schedule.

    I completed the initial phase under the guidance of Senior
Field Economists, Michael Enslin and Alfred Manual. Mr. Enslin would
compliment me on my telephone skills which he thought were good con-
sidering that I had no prior sales experience, unlike himself.
After an initial visit made with Mr. Manual in which he observed me

conduct, he would say that I have good basic interviewing techniques.
Mr. Manual would later point out during training that he had trained
many Economists still with the regional program.  After completing
OJT I would work independently until the second training phase.
Midway into my second survey assignment, I did two Quality Assurance
visits with Wilson Romero, Reviewer.  After each visit  I received
immediate feedback.  At the completion of the second visit, Mr. Romero
told me that I had collected sufficient information to complete write-
ups on the visits without having to recontact the respondants.

At the performance review of February 24, 1993, Charles
Chinnis, Team Chief and Supervisor,  described me as "intelligent".
I was noted as meeting all performance elements which I later learned
may have been better than either Reginald Harris(GS-7) or Craig Walters
(GS-7), fellow probationary team members.

After working on my third survey, I learned that a schedule
I completed would be submitted along with the work of other probationary
workers for national audit.  No direct feedback was given, so I believed
that the training I received was on par.  Around this time, Fred Childress,
Reviewer, would say that I provided adequate documentation on my write-ups
to explain why I wasn't receiving many questions for clarification.
During  a  resurvey conducted the month of April, 1993, Chris Robertson,
Survey Coordinator and Field Economist, congradulated me on obtaining
authorization to conduct an interview from a respondant that refused
cooperation on the previous survey.  Mr. Robertson indicated that an
appreciation of one's work efforts was rarely noted by the Bureau.
Mr. Robertson did work under James Beddingfield, Team Chief, at the time.

On June 1, 1993, official realignment of teams took place.
Organization of teams from two to three took place.  At this time it

was announced that Craig Walters accepted reassignment to another program. I chose to work under Mr. Beddingfield simply because the geographical assignment included Florida, my declared state of residency. I noticed others stated preferences on the basis of supervisor. I attended a farewell luncheon given on behalf of Teresa McGee, one of at least five Junior Field Economists who resigned during the course of a year. Shirley Brown, Sr. Field Economist, would later explain that management selected many of these Junior Field Economists because they "knew" they would leave.

I asked Ms. McGee about her reasons for leaving, to which she cited the "people" and lack of personal freedom. Ms. McGee would explain how she was required to travel to and from survey cities on short notice request. I did not ask her to point out the people she referred to, but Ms. McGee did work for Mr. Beddingfield during her tenure.

The first order of business under the supervision of Mr. Beddingfield was to complete full survey OJT. I was sent to Tampa where the survey was in full swing. I trained with Shirley Brown as Ted Holman, Survey Coordinator, directed. Most of Ms. Brown's remaining schedule assignment had dates of appointments set. The one appointment Ms. Brown assigned for me make would be for a schedule she would later reassign to another Field Economist. I had no real opportunity to demonstrate one qualifier for any visit made in Tampa (Schedule appointments effectively). One schedule had little potential for full job list matches, and a couple of schedules were for limited survey collection. The quality of training materials should have been better, or at the very least, taken into consideration, before Mr. Beddingfield charged me with taking so much time to complete OJT.

As it were, the first training visit made was to an establishment chosen for limited job list survey. Ms. Brown and I agreed that I would conduct the interview, and that the interview would be done from scratch althoughthe establishment had provided information for the last two surveys in Tampa. When we arrived at the establishment, the respondant greeted Ms. Brown and myself and walked us to her office. On the way, conversation revealed the industry and scope of business. Once in the office, I explained that I would be conducting the interview. Business cards were exchanged, and I asked the respondant if the infor-mation on the card was current and correct & the respondant indicated it was. Ms. Brown immediately interrupted and told me to read the card to verify the information on it, which I did. Ms. Brown would interrupt again, asking about the industry and scope of business. When I told her what I had heard earlier to be true, Ms. Brown corrected me without verification from the respondant. Ms. Brown would later ask me to verify this information during recontact. Despite these interruptions, the respondant encouraged me to continue, reassuring me that I was doing fine. I thanked the respondant, adding that I hoped Ms. Brown thought so too. The interview lasted two hours, in part due to questions Ms. Brown would add concerning the old schedule write-up. Ms. Brown indicated that I wasn't organized; I had less than an hour to prepare for the interview.

The very next morning, Ms. Brown asked me if I would recontact the respondant to pick up additional information to match the establish-ment's Accounting Clerks. I told her I would upon completing an initial write-up. Ms. Brown assumed that I was trying to avoid making the callback, and suggested that I could make as many callbacks as I wanted.

I told her that I wanted to reduce the number of callbacks to minimize additional burden on the respondant. She asked me, "Who said that?" I replied, "Charles" (Chinnis). I expressed that I may have seen it written in a memo. Ms. Brown said she would tell him I said this.

I later presented her with questions that I felt could be used for matching the Accounting Clerks. These questions were very specific requiring a short answer from the respondant. When I showed these questions to Ms. Brown, she crumpled the page of questions up, saying that we weren't going to "spoonfeed" the respondant, and revised the question to simply read, "What are they doing?" It would be two weeks before the respondant would get in touch. When I got to the question about the accounting clerks, the respondant asked for the question in writing. I would transmit by fax this question along with even more questions Ms. Brown wanted answers to including one about a highly-paid Secretary previously matched. We never received a reply and submitted the schedule after reconciling the information at hand.

While bringing adverse action charges against me on September 17, 1993, Mr. Beddingfield would critize me for asking questions like "What are they doing?" and for failing to recognize a relatively high-paying secretarial position when training experiences did not indicate that this was a major shortcoming.

Upon meeting Ted Holman at the field office in Tampa, Ms. Brown asked him, "Would you believe that Jose was in the Army?" I did serve four years of active enlisted service, Mr. Holman was aware of this as he was involved in conducting the initial formal classroom training session I attended. Apparently Ms. Brown did not think that I fit her stereotypical image of a soldier. I was offended by her remark because my service was honorable, and something I was proud of as

a first generation American.  I realize my life may  have been very

different had my father not joined the U.S. Navy.  Because Ms. Brown

was not aware of this, I did not think it appropriate to tell her how

offensive I found her disbelief to be.

    Ms. Brown would interrupt interviews she initially told me I

could conduct, on every visit we did together.  Ms. Brown would simply

pick up on the next logical question to be asked whenever I paused.

After the third  interview, I told her that it embarrassed me, but

she would reply that I only embarrass myself, thinking she could do

no wrong.  She intimidated me by saying that I would "cry to Jim"

(Beddingfield) with this.  Ms. Brown would later counter that because

a banded pay system was in use, this particular interview was "over

my head" and would solicit the support of others.  Because I had

never encountered such a system, I did not argue the point, but I

did let her know that I would learn more if she would just allow me to do

more of the interview.  On subsequent visits she would explain that

the interruptions were made because she thought I was "losing control".

However she would not tell me why she thought this.

    Early on, Ms. Brown would make presumptions about my character.

On the second day of OJT, she said I was "difficult" and would account

for making this statement by saying, "Word in the office is..."  Not

knowing who or why anyone would say this, I replied that I do try to

resolve any differences directly with the person first.  I asked her if

she ever had such differences and she replied, "Never."  Ms. Brown

would later brag about how Mr. Beddingfield sided with her when she

had disputes with Reviewers, Levi Golphin and Jerry Heindle.  Ms. Brown

admitted that she could be "very convincing."  Lending to a lack of

credibility, after a Friday morning visit,  Ms. Brown would tell me

that it would be alright if I departed the survey area hours before

close of business, adding that she would deny ever saying this if
I ever told anyone.

Ms. Brown would also admit that many within the Bureau thought she
held favor due to the fact that she was the first among the expansion
staff instated two years ago to be promoted. I thought she deserved her
rank, I observed her to be an effective interviewer and a knowledgeable
field economist. I also believed that she was the hardest worker of the
team Mr. Beddingfield headed. I knew I could learn much from her,
but she maintained such a condescending attitude towards me in some part
due to my national origin, that she would not give me advice and
instruction to promote my progress. The longer I tried to deny that
this was happenning, the greater detrimental effect it had on my
performance.

During the training period with Ms. Brown, there were incidents
that maliciously discredited my integrity and ability to do the job.
On an observational visit conducted July 14, 1993, Shirley Brown
first asked the respondant for the name of the establishment to which
she received a reply and then allowed the respondant to visually inspect
the pre-printed ID label which was verified to be correct. Because I
only copied what I heard, I was unaware of how the name appeared on the
label. Later that afternoon, Ms. Brown pointed out a difference in the
name and proceded to criticize me in the presence of Ted Holman, Bill
Thurman, J.D. Bauserman, and Wilson Romaro saying that if I can't
take notes then I can't do the job.

While reviewing a schedule write-up (7/28/93) for an interview
conducted on July 22, 1993, in the presence of Ted Holman and Bill Thurman,
Ms. Brown wrongly accused me of "making up" information. She had
previously instructed that, "If I don't hear it or see it," then I
couldn't write it in the documentation. In the comments of one schedule

I wrote about renovation work based on the observation of taped off areas, empty rooms, and scaffolding; and the statement by the respondent that the establishment had been recently acquired and had just resumed operations after long hiatus.  Instead of calling that day to verify the information, Ms. Brown called first thing next morning with just the two of us present to verify that the conclusion I made was correct.  Ms. Brown would review my schedules at least twice, pointing out words that she felt weren't accurate enough, and rewriting passages she thought didn't lend strong or decisive support to the job matches made.  Because of this scrutiny, I would stay late in the office working on write-ups.  One afternoon I did this, Ms. Brown reminded me that it was against union rules to work in the office late.  Ms. Brown would later reschedule interviews and reassign the one interview I scheduled an appointment for because I couldn't keep pace with the write-up.

I followed all instructions and advice prescribed to me during training to the best of my ability including  cold calling practice, during which on July 15, 1993, Shirley Brown laughed, slapping Ted Holman on the back saying, "Would you look at him!" undermining an attempt to improve my questioning skills.  Ms. Brown would later recommend that I write scripts, practice asking questions to myself, and would conduct mock interviews with me.  She would tell me to start and stop over and over again if I didn't repeat a phrase word-for-word or if the delivery did not meet her satisfaction.  Such techniques would be recommended despite the Manual of Procedures statement against using a "canned" approach.

My letter of termination  points out that I received more on the job training than normal, but the charge does not consider the time loss from rescheduling appointments, preparation, which Ms. Brown

insisted that "everyone" did, & the lack of quality training materials during the Tampa survey.  I trained at the convenience of the program. Although two other Senior Field Economists were designated during the Tampa survey, both had other commitments in their roles as Field Reviewer and Survey Coordinator.  Neither had any schedules left in their assignments suitable for training purposes to my knowledge.

It was a hostile environment in which to train in.  This may have been intentional with Ms. Brown revealing her surprise at how I was "hanging in there."  In Tampa, the office was small with two rooms shared by the team.  Ms. Brown  told me it was ordered for trainees to work in the office when not in the field.  This would be the office in which horror stories of former agents and mudslinging of fellow team members could not avoidably be overheard.  The negative remarks made would often  extend beyond work performance and ethics, & into speculation of others personal affairs.  Once in my presence, Mr. Holman and Ms. Brown had a conversation in which an indirect reference was made  to indicate that I was gay.  Ms. Brown would state that she was "uncomfortable" around gays, but quickly added that she had gay friends.  On another occasion, Ms. Brown would ask me about the racial make up of another economist that was not so obvious to me. Ms. Brown would also ask me what I thought of Mr. Beddingfield, to this I told her that I considered him to be a hard, but fair man, one who would  "go by the book."

At the All Agents Meeting on August 31, 1993, which covered office and reporting procedures, Ms. Brown would heckle Mr. Bedding-field, interjecting that the rules were being made a mockery of by citing recent acts of insubordination, shirking of responsibilities, and work.  She would complain about the heavy workload she carried.

[Once over lunch with colleagues, Ms. Brown would suggest that conducting

training was a burden for her by saying that she missed her freedom]

Ms. Brown's "whining" as she called it, annoyed Mr. Beddingfield so

much that he had to order her to stop.  On a following day, I overheard

Ms. Brown say that she was seriously considering transfer to another

regional office.

Eventually, I began to make observational visits with other

trainers,such as Chuck Arton and Bill Thurman.  I contend that they

were not able to impartially evaluate my performance due to working

and personal relationships tied to Ms. Brown.  Ms. Brown assisted

Mr. Arton  with his work on at least two separate occassions and

vacationed with Mr. & Mrs. Thurman the weekend of September 17,1993.

Ms. Brown would "bully" both trainers by name calling: "easy" and

"whimp" in my presence. An initial visit on August 24, 1993, went with Mr. Arton

well in my mind because at the very least I was able to get through

the interview without blatent interruption.  Ms. Brown asked about this,

and I told her it went well.  Subsequent visits, Mr. Arton would interrupt However, on

more intentially, nearing the end of an interview done on September

9, 1993,  Mr. Arton ordered me to "drop" a line of questioning, he later

confessed to have erroneously made.  Even the respondant sensed that Mr.

Arton was being hard on me, saying that I did a good interview. Mr.

Arton would harshly criticize the intent one of the questions I used negative

        might_ have had on a respondant.  Afterwards he would

be encouraging, advising me to "Don't give up," and hinted that I

should work for another program.  I have noticed too, that Mr. Arton's

last bit of feedback seemed to fall more in line with the charges

Ms. Brown and Mr. Beddingfield would make. During a phone conversation

on September 13, 1993,  Mr. Arton would tell me that I went around a

question

question like a "doughnut hole." He would tell me that I "somehow"
manage to collect all the information during an interview.

Feedback from Bill Thurman became more positive after each
observational visit I would make with him. This contradicts the
concensus Dr. Bridgeforth, Counselor, discovered in which the
claim that I was "not grasping the elements" was made. I believe
Mr. Thurman understood the effect the abusive treatment I was receiving
was having on my job performance. After the third visit, he mentioned
that I was more relaxed, yet no conversation would surface as to why
I should be under any stress. In the course of this same feedback,
Mr. Thurman told me that I was a good interviewer. Then he took me
by complete surprise by saying, "Word in the office is that you're
a know-it-all." I still don't know why this comment was made.
I explained that I learn something new with each visit I make.

Throughout the entire course of OJT, Shirley Brown attempted
to harrass and belittle me, due in some part to my national origin.
During a schedule review and practice session on July 26, 1993,
Ms. Brown impersonated me during an interview and proceded imitate
what I can only describe to be a "dumb" mute. I tried to pass this
off as some kind of joke, but she said she was serious.

At times it seemed as though the only reason she came into
office was to cause grief. Upon arriving into the office on July
25, 1993, Ms. Brown wrongly accused me of not preparing for the interview.
Ms. Brown then told me that she, and not Mr. Arton, as previously
arranged, would be observing me on this visit. Ms. Brown began
to review the previously collected schedule in my presence when
she encountered ablock of documentation in the wrong place that I
had noticed too when I went through it. As I agreed with her, she

told me that I didn't know anything about this job.  I told her

that I wasn't claiming to know everything about a particular job,

but I knew something.  To this she replied I knew nothing.  I began

to tell her how I arrived to this conclusion on the schedule, but

she would hear nothing of it.  So incensed was I at her failure

to give me proper credit for anything I had learned during the year,

that I asked her if she was trying to get me to resign. She wouldn't

even look at me .  at  this point, and with no expression on her face,

she finished review of the schedule in another room.

The letter of termination that Mr. Beddingfield served upon

me was done in constructive manner.  Mr. Beddingfield called me into

this meeting without adequate prior notice on September 17, 1993.

I was told that the letter of termination would be delivered that

day unless I "voluntarily" resigned.  Because I was unaware of my

rights, I  initially resigned.  After seeking legal counsel, I decided

that it was in my best interests to deem my resignation null and void.

Mr. Beddingfield would serve the letter upon me on September 22, 1993.

I have since done research and requested information and have determined

that Mr. Beddingfield  had knowledge of my progress during OJT and

administered Quality Assurance visits upon me perhaps unfairly.

Mr. Beddingfield failed to provide meaningful feedback in a timely

manner.  Mr. Beddingfield claims that schedule reviews constituted

performance feedback·  I contend  that this interpretation may not

be legitimate.  Mr. Beddingfield consciously avoided giving me feedback

and failed to communicate his expectations.  Mr. Beddingfield has failed

in his role as supervisor as described in the Federal Personnel Manual.

(Subchapter 8-5)  It is because Mr. Beddingfield knowingly violated these

rules and regulations that I claim that he acted with discrimination,due

in some part on my national origin, in dismissing me.

It is due to these events, that I make this appeal to the Director, Directorate of Civil Rights to call an investigation into these claims. I have completed the counseling informally without restoring peace of mind. I have been employed in many a workplace since the age of 16, and have never encountered  an injustice of this proportion.  I believe my rights as an employee have been violated and submit this complaint to preserve those rights.  I found my work with the Bureau to be rewarding and challenging.  I contend that I was an asset to the program I was assigned to by performing assignments in a diligent and ethical manner.  I would continue to prove an asset if reinstated or reassigned.

I have encountered the name-calling normally associated with discrimination throughout my life.  However, less obvious forms of discrimination such as mind games are not so easily dealt with because the victim is not aware that he or she is being treated differently. It's for that very reason that such forms of discrimination inflicts more agony upon the victim.  It is my hope that the investigation is receptive to these forms of discrimination.  As the U.S. Department of Labor strives to improve the American workplace, it should begin within its own created agencies to conform to high ideals and make employment free of discrimination.

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I.(a) PLAINTIFFS

DELACRUZ, JOSE

**00-6171**
**CIV-ZLOCH -**
**MAGISTRATE JUDGE**
**SELTZER**

## DEFENDANTS

U.S. DEPARTMENT OF LABOR
HERMAN, ALEXIS M.
SECRETARY OF LABOR

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   BROWARD

(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____

(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

CAT A O'ROcv6171- Zloch Mag Seltzer

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

JOSE DELACRUZ
2420 NE 7 AV
FT LAUDERDALE FL 33305 (954) 566-9948

ATTORNEYS (IF KNOWN)

**(d)** CIRCLE COUNTY WHERE ACTION AROSE:   DADE,  MONROE, (BROWARD,) PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION   (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☒ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN   (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT   (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury – Med. Malpractice | B☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury – Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | B☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | | B☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | | ☐ 640 R.R. & Truck | **A PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| B☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| | | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/Exchange |
| B☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | | | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | **A LABOR** | **B SOCIAL SECURITY** | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 893 Environmental Matters |
| | | | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 894 Energy Allocation Act |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | B☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| B☐ 220 Foreclosure | ☒ 442 Employment | **HABEAS CORPUS:** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 950 Constitutionality of State Statutes |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | B☐ 530 General | | A☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 890 Other Statutory Actions |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | A☐ 791 Empl. Ret. Inc. Security Act | A☐ 871 IRS – Third Party 26 USC 7509 | A OR B |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION   (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

Title VII of the Civil Rights Act of 1964 for employment discrimination

LENGTH OF TRIAL
via ___ days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

DEMAND $   20

CHECK YES only if demanded in complaint:

JURY DEMAND:   ☒ YES   ☐ NO

## VIII. RELATED CASE(S) IF ANY   (See instructions):

JUDGE _____   DOCKET NUMBER _____

DATE   2/2/00

SIGNATURE OF ATTORNEY OF RECORD _____

FOR OFFICE ONLY   IFP   02-02-00

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____